IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ABHE & SVOBODA, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. L-05-498 |
| | * | |
| BELL BCI COMPANY, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

*************

**MEMORANDUM**

This is a contract dispute involving the construction and painting of two jet fuel tanks for the Department of the Navy.  BELL BCI Company ("BELL"), the general contractor on the project, hired Abhe & Svoboda, Inc. ("ASI") to paint the tanks after their construction pursuant to a subcontract dated June 27, 2003 (the "Subcontract"). When confusion over whether the tanks had been constructed in accordance with the specifications issued by the Navy delayed the project, ASI incurred unexpected costs. Although ASI contends that it fully performed under the Subcontract despite the project's uncertainties and delays, BELL disagreed and notified ASI's surety that ASI was in breach of its contractual duties.  This lawsuit followed.

ASI claims that BELL's failure to pay ASI in full for its work (i) violates the Miller Act, 40 U.S.C. § 3131 *et seq*.; (ii) breaches the terms of the bond guaranteeing BELL's performance under the Subcontract; and (iii) breaches the Subcontract.  ASI also claims that BELL is liable for the allegedly defamatory statements made to ASI's surety.

Now pending is BELL's motion for partial summary judgment on these claims.[1] Because issues of material fact preclude summary judgment for BELL, the Court will, by separate order, deny BELL's motion and set a date for trial.

## I. BACKGROUND

In June 2001, the Navy hired BELL as the general contractor for the construction of two jet fuel storage tanks at the Patuxent River Naval Air Station in St. Mary's County, Maryland.[2] BELL's contract required it to construct the tanks in accordance with detailed specifications provided by the Navy, and to periodically submit work plans to the Navy showing how these specifications were to be followed.

Constructing the tanks involved welding metal together in various places. The Navy's specifications entitled "Weld Inspection" provided that the welds were to be inspected in accordance with an industry standard called the American Petroleum Institute's Standard 650 ("API 650"). Another section of the Navy's specifications that concerned the installation of a flexible membrane liner, however, stated that the tanks' interior surfaces—including the welds—were to be finished in accordance with a more exacting industry standard known as NACE RPO-178.[3]

BELL submitted a work plan on October 22, 2001 informing the Navy that the welds would be constructed to conform to API 650. The Navy approved this work plan on November 1, 2001. Accordingly, the tanks were constructed in accordance with API

---

[1] ASI also asserted claims for fraud and negligent misrepresentation. These claims were dismissed pursuant to the Court's February 8, 2006 Memorandum and Order.
[2] Pursuant to the Miller Act, Bell executed a payment bond with United States Fidelity and Guaranty Company and St. Paul Fire & Marine Insurance Company as sureties (the "Payment Bond") for the payment of all persons supplying labor or material in connection with the project.
[3] In general, these standards both concern the relative smoothness of the welds.

650. Following its final inspection on April 2, 2002, the Navy approved the tanks' construction and gave the go-ahead for the tanks' painting to begin. BELL hired ASI as a subcontractor shortly thereafter.[4]

The Subcontract provided that ASI would provide the necessary labor and materials to complete the tanks' painting. In the event that ASI failed to perform under the Subcontract and failed to remedy any contractual deficiencies after receiving notice of default, BELL was entitled to notify ASI's surety and to charge the cost of remedying the deficiency to ASI.

In addition, the Subcontract included a "Disputes Provision" governing the parties' conduct in the event that ASI expended additional time or incurred additional costs not included in the Subcontract's base $995,000.00 price. This provision stated that ASI must give BELL written notice of any claims for additional payment, and that:

> If Subcontractor's claim involves the [Navy,], BELL shall be permitted to pass Subcontractor's claim(s) to the [Navy], as it deems appropriate. The [Navy's] decision on Subcontractor's claim shall be final and conclusive as between BELL and Subcontractor, and BELL shall have no liability to Subcontractor therefore. Subcontractor's recovery is limited to what BELL may recover on Subcontractor's behalf.

In August 2003, before beginning the process of painting the tanks, ASI wrote to BELL seeking clarification on the preparation of the tanks' surfaces. ASI noted that the Navy's specifications required the tanks' surfaces to be free from "weld splatter, sharp fins, sharp edges, burning slag, scabs, slivers, etc." before painting could begin, and ASI

---

[4] ASI was the second subcontractor hired to paint the tanks. The first subcontractor, Thompson Industrial Services, Inc., began painting the tanks in October 2002. When portions of the painting process failed, BELL sought a replacement subcontractor and hired ASI in July 2003.

3

acknowledged that these preparations were its responsibility under the Subcontract. Citing the NACE RPO-178 standard in the Navy's specifications, however, ASI contended that it was not responsible for preparing the tanks' surfaces to bring the welds into compliance with this higher standard.[5]

In response to ASI's letter, BELL submitted a Request for Information to the Navy asking whether NACE RPO-178 applied to the tanks' welds. On August 27, 2006, BELL received the Navy's response that the architect/engineer "believes 'no' is the answer. . . . ROICC[6] concurs. Welds shall be inspected as per API 650." BELL communicated this decision to ASI.

Approximately three weeks later, however, the Navy reversed itself, notifying BELL that, "[u]pon further review and consideration, the government believes that the NACE RPO-178 standard does apply to the welds." In a letter received by BELL on September 17, 2003, a Navy representative noted that "[t]he final decision of the Navy in this matter should . . . come as no surprise, as the NACE RPO standard is the only requirement in the specifications that addresses the condition of the welds and their suitability for coating." The letter also informed BELL that, because "the work to ensure that the welds meet the NACE RPO-178 standard . . . should have been included in the base contract price," "the Navy rejects any compensation for additional work."

Notwithstanding this conclusion, BELL notified the Navy on September 24, 2003 that conforming the welds to the higher standard would significantly delay the painting

---

[5] ASI's opposition to BELL's summary judgment motion asserts that, in addition to falling short of the NACE RPO-178 standard, the tanks had "latent defects . . . unrelated to the smoothness requirement set forth in the Navy's specifications," including "porosity, undercutting, pinholes, weld spatter, and other defects." The Court need not resolve this disputed issue of fact for purposes of BELL's motion for summary judgment.
[6] "ROICC" stands for Resident Officer in Charge of Construction.

process.[7] BELL also created an "Extra Work Order" to track the costs associated with bringing the tanks into compliance, and included the additional costs submitted by ASI in the work order's running tally. Although BELL submitted this extra work order to the Navy when the project was completed, the Navy refused to provide any additional compensation for the costs and delays associated with the additional work.

ASI completed its work on the tanks in February 2004. BELL subsequently requested that ASI return to perform touch-up work on the tanks.[8] When ASI refused to do so, BELL notified ASI's surety that ASI was in default of the Subcontract. Ultimately, ASI agreed to return to perform the touch-up work, and BELL agreed to pay ASI for its costs to do so.

On February 18, 2005, ASI filed this lawsuit claiming that BELL violated the Subcontract by, among other things, failing to pay ASI in full for its work, instructing ASI to begin work before the tanks were in a condition to be painted, and failing to complete predecessor work as scheduled.

## II.   ANALYSIS

The Court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S.

---

[7] ASI disputes the extent of the repairs necessary to the tanks, contending that as BELL and its subcontractors began the process of bringing the welds into compliance with NACE RPO-178, additional problems with the tanks' construction became apparent. ASI asserts that the process of repairing these unrelated flaws resulted in further delays and costs to ASI.

[8] ASI contends that BELL and its subcontractors damaged the paint job after ASI had completed its work; BELL responds that the Subcontract requires ASI to provide all necessary touch-up paint.

5

317, 322-23 (1986).  Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

Applying this well-established standard to the instant case, the Court finds that disputed issues of material fact preclude summary judgment.  These disputed issues include, *inter alia*, (i) whether BELL should have known that NACE RPO-178 applied to the tanks' welds, notwithstanding the Navy's initial representations to the contrary; (ii) whether BELL's performance under the Subcontract caused ASI to incur damages for which BELL is liable; (iii) whether BELL understood ASI's refusal to return to the project to perform touch-up painting to constitute a breach of the Subcontract; and (iv) whether ASI was damaged by BELL's allegedly defamatory statement to ASI's surety.  The Court cannot resolve these questions at the summary judgment stage.

Notwithstanding the parties' conflicting versions of the facts, BELL contends that the Subcontract's Dispute Provision absolves it from liability because ASI's claim for additional payment under the Subcontract involves the Navy.  BELL points to the language of the Dispute Provision stating that "The [Navy's] decision on Subcontractor's claim shall be final and conclusive as between BELL and Subcontractor, and BELL shall have no liability to Subcontractor therefore."  According to BELL, because the Navy denied BELL's request for compensation for the additional work required to bring the

6

welds into compliance with NACE RPO 178, BELL is not required to reimburse ASI for its costs.[9]

ASI responds that, under BELL's interpretation of the contract, BELL is able to insulate itself from liability for a breach of contract claim by declaring that the dispute "involves the Navy." ASI contends that the Dispute Provision cannot shield BELL from liability to its subcontractors when the Navy concluded that any additional costs were attributable to BELL's failure to recognize that the NACE RPO standard applied to the welds. According to ASI, such a result would defy the plain language and intent of the Subcontract.

In light of these conflicting interpretations of the Dispute Provision, the Court finds that the language of the Subcontract is ambiguous. As a result, the Court must consider parol evidence in order to ascertain the Dispute Provision's rightful meaning. This evidence must be adduced at trial and weighed by a jury.

For these reasons, the Court will, by separate order, deny BELL's motion for summary judgment and set a date for trial.


Dated this 30th day of October 2007.


                                                                                       /s/
                                                            Benson Everett Legg
                                                            Chief Judge

---

[9] Even assuming *arguendo* that BELL's interpretation of this provision is correct, ASI has alleged that BELL breached the Subcontract in ways unrelated to the Navy's belated instruction that NACE RPO-178 applied. BELL also maintains that ASI's calculation of its damages is flawed. The question of whether and to what extent ASI suffered damages for which BELL is liable is, under the disputed facts of this case, one properly posed to a jury.